UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEEL STRIP WHEELS, LTD.,

     Plaintiff,

                            Case No. 08-cv-13737

v.                           Hon. Gerald E. Rosen

GENERAL RIGGING, LLC, a Michigan
limited liability company, FRANCIS
BLAKE, SR., FRANCIS BLAKE, JR.,
and PATRICK BLAKE,

     Defendants.
_____/

OPINION & ORDER GRANTING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 30, 2009

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Steel Strip Wheels, Ltd. is a manufacturer of wheels for trucks and

automobiles based in India.  It commenced this action on August 29, 2008, asserting

claims of breach of contract, fraud, and conversion against corporate Defendant General

Rigging, LLC ("General Rigging"), a Michigan industrial equipment dealer.  The

complaint was later amended to include individual Defendants Francis Blake, Sr., Francis

Blake, Jr. and Patrick Blake, all Michigan residents.  Plaintiff's claims arise out of

General Rigging's repudiation of a contract binding it to sell seven industrial presses to Plaintiff.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332(a)(2).

This case is presently before the court on a Motion for Summary Judgment filed by Plaintiff on February 4, 2009.  Plaintiff argues that (1) the corporate Defendant breached the contract by selling and shipping two of the seven presses promised to Plaintiff to another company; (2) the individual Defendants knowingly withheld the fact that the company breached the contract for the purpose of misleading Plaintiff to modify the terms of the contract and complete the sale of the remaining five presses; and (3) the corporate Defendant wrongfully withheld and continues to withhold $75,000 owed to Plaintiff.  In response, General Rigging admits that it owes Plaintiff $75,000, but otherwise argues that the repudiation of the agreement was justified by Plaintiff's failure to provide contractually required open top containers for shipment without adequate assurances that it would timely perform.  General Rigging further argues that Plaintiff's fraud claim is barred by the economic loss doctrine.

Having reviewed the parties' written submissions in support of and opposition to Plaintiff's motion, the accompanying exhibits, and the record as a whole, the Court finds that the pertinent facts, allegations, and legal issues are sufficiently presented in these materials, and that oral argument would not assist in the resolution of Plaintiff's motion.  Accordingly, the Court will decide this motion "on the briefs."  See Local Rule 7.1(e)(2),

2

U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings.

## II.  FACTUAL BACKGROUND

At the time of the events in this case, Plaintiff was building a new manufacturing facility in India, for which it needed industrial presses.  Plaintiff's machinery agent learned of several used presses for sale by General Rigging that could fulfill these needs. On or about June 30, 2008, Plaintiff's representative, A.V. Unnikrishnan and his machinery agent, Prabhakar Shukla, met with General Rigging's representatives at the company's Detroit offices.  At the time, General Rigging was owned and run by Francis Blake, Jr.  Mr. Blake in turn employed his father, Francis Blake, Sr., and his brother, Patrick Blake, both of whom were involved in negotiating new contracts and sales.  Upon meeting with Mr. Unnikrishnan and Mr. Shukla, Francis Blake, Jr. showed Mr. Shukla several 1000-ton presses available in General Rigging's Detroit inventory.  The following day, the parties also inspected two 1600-ton presses, which were stored in a shuttered factory building in South Bend, Indiana.

On July 2, 2008, Plaintiff's representatives met with Francis Blake, Sr. over four to six hours to negotiate the terms of a sales contract.  In the end, the parties reached an agreement which was memorialized in an invoice prepared by Francis Blake, Jr.  The invoice outlined the sale of seven presses: five 1000-ton presses for $90,000 each and two 1600-ton presses for $172,500 each.  In addition, the invoice indicated that Plaintiff would pay $10,000 to cover packing charges for each press.  The invoice required a

3

deposit of $175,000 by wire transfer, due before July 15, 2008.  Subsequently, installment

payments for each press would be due upon shipment.  The invoice specified that General

Rigging was responsible for securing the presses "in a seaworthy manner for ocean

shipment. . . . All parts to be loaded into open top containers or into skids for break bulk

per requirements."  (Pl.'s Mot. for Summ. J. Ex. 1.)  Plaintiff was responsible for

supplying open top containers for packing and for all local freight and ocean shipment.

(Id.)  Finally, the invoice stated that all presses would be shipped by September 30, 2008.

      Both Francis Blake, Jr. and Francis Blake, Sr. testified that a critical issue for

General Rigging during the negotiation process was the time of performance: the Blakes

hoped to begin shipping right away.  At deposition, both said that Plaintiff's

representatives claimed to be able to obtain open top shipping containers within a week of

signing the invoice and repeatedly assured the Blakes that a contract with a shipping

company was already in place.  (Francis Blake, Jr. Dep. 16:13-24; Francis Blake, Sr. Dep.

24:21-25.)  By contrast, Mr. Unnikrishnan testified that he told General Rigging's

representatives at the close of negotiation that he would *begin* contacting shipping

companies upon returning to India, and that dismantling and packing could conceivably

begin within fifteen or twenty days.  (A.V. Unnikrishnan Dep. 46:7-12, 47:3-9.)  He

denied that any specific date was given for when the open top containers would arrive in

Detroit and South Bend, where the presses were to be dismantled; he did however testify

to telling the Blakes that Plaintiff had a relationship with Kuehne+Nagel, a shipping

company that usually handled Plaintiff's exports.  (A.V. Unnikrishnan Dep. 47:15, 47:21-48:13.)

In the weeks that followed, several shipping companies including Kuehne+Nagel contacted General Rigging to prepare price quotes for Plaintiff.  General Rigging claims to have only learned that Plaintiff did not already have a shipping contract in place at this time. (Def.'s Br. in Opp'n  7.)[1]  On July 23, 2008, Patrick Blake sent an email to Mr.

---

[1]      The sole affidavit submitted in support of General Rigging's Brief in Opposition to Plaintiff's Motion for Summary Judgment is an affidavit of "Francis A. Blake."  Both Messrs. Francis Blake, Jr. and Sr., have the middle initial "A," however the affiant indicates that he is "in charge of negotiating contracts and assisting Rigging in the pursuit of business opportunities." (Blake Aff. ¶ 1.)  Based on other evidence in the record, it appears that the affiant is the elder Francis Blake.  Beyond this, the affidavit offers only a blanket adoption of the statement of facts as outlined in General Rigging's Brief.  (Blake Aff. ¶ 2) ("I have read the Statement of Facts section of General Rigging's Brief. . . . Based upon my participation in the events and my review of relevant documents, I have personal knowledge of the facts set forth therein and aver that they are true and accurate to the best of my knowledge.")

This is a questionable practice, at best, in the context of a dispositive motion, as it converts the personal knowledge requirement of Rule 56(e)(1) of the Federal Rules of Civil Procedure into a mere formality.  Although the Court is certainly aware that lawyers routinely draft affidavits for their lay clients, the virtual circumvention of the personal knowledge requirement here by summary blanket adoption makes the Court's job of insuring the affiant is in fact competent to testify to all of the matters in the affidavit all the more difficult because the Court is forced to search the statements drafted by General Rigging's counsel in its brief and assume that *all* are based on the personal knowledge of a single witness.  Nevertheless, the Court has made an attempt to corroborate General Rigging's statement of facts/Francis Blake, Sr.'s "affidavit" where possible, giving General Rigging as the non-moving party the benefit of the doubt.  Where, as in this instance, the Court is unable to find corroborative evidence in deposition testimony and other evidence in the record, it is forced to cite simply to General Rigging's Brief in Opposition.  However, for purposes of this Opinion, it does not appear that material questions of fact turn on the few instances where these statements cannot be thus corroborated.

5

Unnikrishnan urging him to hire a shipping company as soon as possible: "We need to have the containers available to begin packing on Monday, July 28th." (Def.'s Br. in Opp'n Ex. 4.) In response, Mr. Unnikrishnan wrote that he hoped to have a shipping arrangement finalized by the end of July. (Id.) In the meantime, General Rigging sent a crew to South Bend to begin the dismantling of the 1600-ton presses. (Def.'s Br. in Opp'n 7.) A crew at the Detroit facility was allegedly left idle without the requisite containers to begin packing the 1000-ton presses. (Id.) Towards the end of July, Kuehne+Nagel's Ocean Manager in Detroit, Tammy Loeman, visited General Rigging's Detroit facility to inspect the five 1000-ton presses and meet with Francis Blake, Sr. and Patrick Blake.

> On July 28, 2008, Patrick Blake again wrote to Mr. Unnikrishnan:
>
> Have you hired a shipping company yet? We must have container [sic] in our facility this week. Please advise by return email as soon as possible. If we do not receive containers this week [we] will not be able to make your schedule and we have a [sic] offsite job scheduled after September 30th that will required all our employees.

(Def.'s Br. in Opp'n Ex. 5.) The next day, Plaintiff and Kuehne+Nagel signed a letter of intent, indicating that shipment of the seven presses was a "time bound project" and that the presses should be "lifted" from General Rigging's Detroit and South Bend locations before August 25, 2008. (Pl.'s Mot. for Summ. J. Ex. 8.) It did not address the need for open top containers. (Id.) By email dated July 29, Mr. Unnikrishnan wrote to Patrick Blake, "We have engaged M/s. Kune+Nagal [sic], who will be in touch with you." (Id.) General Rigging contacted Kuehne+Nagel in an attempt to make arrangements for the

6

delivery of the open-top containers only to learn that Kuehne+Nagel was not yet formally

under contract with Plaintiff.  (Def.'s Br. in Opp'n 8.)

On August 4, 2008, Francis Blake, Sr. emailed Mr. Unnikrishnan again:

> I am very troubled by the lack of progress on the shipment of the presses.
> During negotiations when you requested for payment after loading you
> assured me that containers would arrive within one week.  It has been 30
> days and you have not contracted a shipping company.  We do not have any
> commitment for containers or for trucks for skidded items.  We require 30
> to 45 days from the date the first containers arrive to pack these presses.
> This delay has caused a cash flow problem for our company.  We made the
> deal with you with the understanding that the presses would be shipped in a
> timely manner with no delays.  I can offer the following solutions:
> (1.) Cancel the deal for the two 1600-ton presses and renegotiate the deal
> for the 1000-ton presses.  (2.) Wire transfer Payment in full for the seven
> presses tomorrow.  (3.) Cancel the deal and we will return your deposit.
> These options are not negotiable.  I require a response this evening or I will
> cancel our deal and return your deposit.

(Pl.'s Mot. for Summ. J. Ex. 10.)  In an email directed to Patrick Blake the following day,

Mr. Unnikrishnan responded:

> I am very sorry to say there was no commitment from my side to place the
> containers within a weeks [sic] time.  I fully agree to honor the mutually
> agreed terms as per the agreement between the two company [sic].  I am
> finalising [sic] the terms with the logistic [company] and shall arrange to lift
> the stuffs [sic] at the earliest possible.  I seek your cooperation in this
> regard.   In case you can arrange the logistics upto [sic] Chennai, iam [sic]
> ready to accept CIF Chennai terms also.

(Pl.'s Mot. for Summ. J. Ex. 11.)

On the morning of August 5, 2008, General Rigging reinitiated contact with one of

its existing customers, Titan International, Inc. ("Titan").  Titan and General Rigging had

previously discussed the sale of the two 1600-ton presses prior to General Rigging's

7

negotiations with Plaintiff.  General Rigging informed Titan that the 1600-ton presses were available for sale; it did not inform Titan of the contract with Plaintiff, explaining only that liens on the presses had been discharged and that the presses were now available "free and clear."  (Pl.'s Mot. for Summ. J. Ex. 12.)  On August 6, 2008, General Rigging issued an invoice to Titan for the sale of the presses, at a price of $225,000 each, plus $45,000 each to load them onto Titan's trucks.  Titan wired full payment to General Rigging on August 8, 2008, and the 1600-ton presses were delivered to Titan's Illinois facility by late August.

Meanwhile, Plaintiff and Kuehne+Nagel finalized a shipping contract on August 5, 2008 for $550,000, covering the logistics of transporting the seven presses overseas.  Mr. Unnikrishnan wrote to Patrick Blake to inform him of this news and of the fact that a Kuehne+Nagel official would be contacting General Rigging for further details.  On August 6, 2008, Patrick Blake emailed Tammy Loeman to inquire about the availability of open-top shipping containers.  She responded that Kuehne+Nagel had located three and that she was searching for more.  No additional open-top shipping containers were ever located and Ms. Loeman ultimately sent written confirmation that there would be insufficient open top containers to ship the presses.  Ms. Loeman, along with Plaintiff's representatives, sought an alternative solution.  By mid-August Ms. Loeman informed General Rigging that she had arranged for Great Lakes Packing Company ("Great Lakes") to place the dismantled presses in ordinary ocean shipping containers.  Plaintiff would pay Great Lakes directly for this service.

On August 8, 2008, Mr. Shukla traveled to South Bend, Indiana to oversee the dismantling of the 1600-ton presses.  At the time, nobody from General Rigging's offices informed Mr. Shukla or Ms. Loeman of the sale of those presses to Titan, executed two days prior, although they continued to make arrangements for shipment of all seven presses.  As late as August 12, 2008, Patrick Blake provided the weight and dimensions of the (already sold) 1600-ton presses upon Mr. Shukla's request.  On August 14, 2008, Mr. Shukla and Ms. Loeman met with Patrick Blake to discuss a detailed shipping plan for all seven presses.  Based on the ongoing concerns about Plaintiff's ability to deliver shipping containers and General Rigging's cash flow problems, Mr. Shukla offered to have Plaintiff make two installment payments of $200,000 for the 1000-ton presses, rather than the previously agreed upon payments due on shipping.  Together with the $175,000 already tendered as deposit, these two payments would represent payment in full for the five 1000-ton presses ($500,000) and partial payment for the two remaining 1600-ton presses ($75,000 out of $365,000 due).  The new payment plan was approved by Mr. Unnikrishnan on August 20, 2008 and memorialized in two invoices, which described the payments as "Advance of (5) 1000-ton Presses" to satisfy the July 2, 2008 agreement.  (Pl.'s Mot. for Summ. J. Ex. 19.)  Plaintiff remitted the two $200,000 payments by wire transfer on August 21 and August 29.  Still no one from General Rigging informed Plaintiff that the 1600-ton presses were sold and in the process of being shipped to Titan.

By August 25, 2008, General Rigging was making progress on the shipment of the

9

1000-ton presses.  However, when Mr. Shukla again traveled to South Bend to oversee progress there, he noticed that some of the parts of the 1600-ton presses were missing since his last visit.  Although General Rigging employees allegedly told Mr. Shukla that the presses had been moved to another location because of space constraints at the South Bend location, upon further investigation, he learned that the parts had been shipped to Titan.

Based on these allegations, Plaintiff commenced this suit on August 29, 2008 asserting state-law claims of breach of contract, fraud, and conversion.

### III. <u>ANALYSIS</u>

**A.     The Standards Governing Motions for Summary Judgment**

Through the present motion, Plaintiff seeks summary judgment in its favor.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where, as here, a party (Plaintiff) seeks an award of summary judgment in his favor on issues as to which he bears the burden of proof, Plaintiff's

10

"showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. Pack v. Damon Corp., 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." Pack, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.      Breach of Contract Claim**

In support of its Motion for Summary Judgment, Plaintiff argues that General Rigging repudiated the contract when it failed to deliver the two 1600-ton presses to Plaintiff as promised. General Rigging concedes that it sold the presses to Titan before time for performance, but argues that the sale was justified to mitigate possible damages from Plaintiff's delay in obtaining shipping containers. Furthermore, General Rigging argues that Plaintiff's misrepresentations about the status of shipping arrangements in the

11

weeks following the July 2, 2008 agreement provided General Rigging with reasonable grounds for insecurity under Mich. Comp. Law § 440.2609, thereby excusing General Rigging's sale of the presses.

      **1.**      **Plaintiff Did Not Repudiate the Contract Where Alleged Oral Assurances That Plaintiff Would Supply Shipping Containers Within A Week Are Barred By the Parol Evidence Rule and Delays In Arranging Shipment Did Not Substantially Impair the Value of the Contract.**

Both parties agree that this case is governed by Michigan's enactment of the Uniform Commercial Code ("UCC"). Under the UCC, a contract for the sale of goods for the price of $1,000 or more is not enforceable unless there exists a writing sufficient to indicate that a contract has been made between the parties and signed by the party against whom enforcement is sought. Mich. Comp. Laws § 440.2201(1). If either party to a contract repudiates the contract with respect to a performance not yet due "the loss of which will substantially impair the value of the contract to the other," the aggrieved party may await performance by the repudiating party, resort to any other remedy for breach and/or suspend his own performance. Mich. Comp. Laws § 440.2610; see also Stoddard v. Manufacturers. Nat'l Bank of Grand Rapids, 234 Mich. Ct. App. 140, 163, 593 N.W.2d 630, 640 (1999). Anticipatory repudiation occurs where there is "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Mich. Comp. Laws § 440.2610 cmt. 1.

Here, while the parties concede that a valid contract was formed under the UCC, they dispute the terms of the contract as a threshold matter. Plaintiff argues that General Rigging cannot rely on Plaintiff's failure to provide open-top container within several weeks of signing the July 2, 2008 agreement where Plaintiff was under no obligation to do so by a set date. General Rigging argues that it gave Plaintiff a discounted price on the presses based on Plaintiff's alleged oral assurances that it could quickly provide shipping containers—General Rigging could then pack and ship the presses, and be paid upon shipment within several weeks. The relevant contract language provides only: "Buyer is responsible to supply open top containers." (Pl.'s Mot. for Summ. J. Ex. 1, p. 2.) While there is no express "time is of the essence" clause, there is also no provision declaring that the invoice was intended to serve as a complete integration of the agreement between the parties. Ultimately, the invoice provides that the presses ship by September 30, 2008, but is silent with respect to the time of performance for Plaintiff's obligation to supply shipping containers. Therefore, the Court must first address whether oral statements made prior to or contemporaneous with the signing of the invoice are admissible to supplement the terms of the agreement.

Michigan courts follow the general rule that does not permit extrinsic evidence to contradict the terms of a written contract that was intended by the parties to be a complete expression of their agreement. Johnson Controls, Inc. v. Jay Industries, Inc., 459 F.3d 717, 727 (6th Cir. 2006) (*quoting* CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 891 (6th Cir.1996)). The statutory provision regarding parol evidence provides:

13

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade (section 1205) or by course of performance (section 2208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Mich. Comp. Laws § 440.2202.  The commentary to Section 440.2202 further states, in part: "If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact."  Mich. Comp. Laws § 44.2202 cmt. 3.

The invoice in this case appears to have been a final expression of the terms negotiated by the parties on July 2, 2008.  Although it lacks an integration clause, the invoice unambiguously delineates price, quantity, schedule of payments, and ultimate time of performance.  Thus, to the extent that General Rigging seeks to rely on statements allegedly made in the course of negotiation to change the scope and nature of Plaintiff's obligations, the parol evidence rule forbids consideration of those statements.  See In re Skotzke Estate, 216 Mich. App. 247, 251-52, 548 N.W.2d 695, 697 (1996).

Moreover, had the parties actually reached an agreement with respect to Plaintiff's purported time of performance to arrange for its obligation to supply open top shipping containers, such a provision—allegedly so integral to General Rigging—would certainly

14

have been included in the written agreement.  See Mich. Comp. Laws § 44.2202 cmt. 3;

General Motors Corp. v. Alumi-Bunk, Inc., No. 270430, 2007 WL 2118796, at *5 (Mich.

Ct. App. July 24, 2007), rev'd in part on other grounds, No. 135117, 2008 WL 5205678

(Mich. Dec. 12, 2008) (excluding oral assurances made alongside contract negotiations as

too significant not to have been included in written contract under parol evidence rule).

In General Motors, an unpublished opinion, the Michigan Court of Appeals evaluated a

breach of contract claim on an agreement to sell a steeply discounted fleet of trucks to the

defendant.  The plaintiff, General Motors, argued that it offered the discounted rate with

the understanding that the defendant agreed to "modify, or 'upfit,' the vehicles before

reselling them, so that they would not compete with other non-modified vehicles on the

market."  Id., at *1.  When the defendant failed to upfit the vehicles as orally promised,

and sold them in their normal condition, General Motors filed a complaint alleging breach

of an express or implied contract.  Id.  Despite the fact that the agreement between the

parties contained no integration clause, the Michigan Court of Appeals found that the "the

upfitting requirement was a significant factor and therefore was something that 'if agreed

upon . . . would certainly have been included in the document.'"  Id., at *5.

In this case, General Rigging has made similar allegations: principally, that

Plaintiff orally promised to arrange shipment in open top containers quickly and that

General Rigging would not have sold the presses at the negotiated price without such a

promise.  However, given the significance of this apparent condition and the cost of

securing nearly thirty open top containers within just a few weeks, it is significant the

15

otherwise complete agreement conspicuously omits any mention of General Rigging's timing concerns.  Francis Blake, Sr. testified that Francis Blake, Jr. himself typed up the terms of the invoice on July 2, 2008 after the parties "negotiated back and forth changing certain items."  (Blake, Sr. Dep. 22:14-17.)  The invoice is very specific with respect to time for payments and ultimate time of performance.  On the day the invoice was drafted, the parties made handwritten changes and amendments to it, each initialed and dated. (Id.)  General Rigging's representatives had ample opportunity to negotiate a time of performance term for Plaintiff's obligation to supply open top shipping containers. Because time of performance clause for Plaintiff's obligations is the type of term that would certainly have been included in the document had the parties agreed upon it and no term was actually included in the invoice beyond the final shipping deadline of September 30, the Court finds that there was no obligation to arrange for supply of open top containers for shipment by a set date.

Finally, even if Plaintiff had an obligation to provide shipping containers in a "timely fashion" as General Rigging argues, delays in obtaining open top containers did not go to the heart of the bargain.  The parties arranged for the sale of seven presses to be shipped within three months at a price of $865,000.  Frank Blake, Sr. explained that, although General Rigging appeared to have a standing offer from Titan for the two 1600-ton presses, it opted to move forward in its deal with Plaintiff for several reasons.  First, Plaintiff was willing to buy both the five 1000-ton presses and the two 1600-ton presses, so General Rigging would benefit from selling seven presses at the same time, rather than

16

merely the two 1600-ton presses.  (Blake Sr. Dep. 36:7-8.)  Second, although the contract

price with Plaintiff for the 1600-ton presses was less than the offer from Titan, Francis

Blake, Sr. reasoned that negotiations had already moved forward with Plaintiff and

General Rigging would benefit from gaining Plaintiff as a new customer.  (Blake Sr. Dep.

36:16-23) ("[W]e assumed this would be a new customer, maybe there was an advantage

that we could get some new business. . . .  So I guess it just—we just really didn't care at

the time which way it went.")  Thus, although General Rigging seeks to characterize the

"benefit of the bargain" as loading the presses as quickly as possible to get quick cash,

close examination of the record reveals that the bargained for exchange was quite simply

the sale of all seven presses to a new customer.  Plaintiff remained ready to fully pay the

amount as negotiated, and even agreed to change its payment schedule to two $200,000

lump sum payments in response to General Rigging's cash flow concerns.  Mr. Shukla

and Ms. Loeman continued to work with General Riggings's representatives to arrange

for the shipment of the 1600-ton presses, and the evidence indicates that had Plaintiff

followed the shipping plan finalized during the month of August, the presses could have

shipped by the September 30 deadline.

Based on the foregoing, General Rigging has failed to show that Plaintiff

repudiated its obligation under the contract.  It strikes the Court that what has really

happened here is that General Rigging was strapped for cash and the Titan deal provided

an opportunity for a quick, and needed, infusion—but at Plaintiff's expense.  The

interjection of an early open top container requirement by General Rigging as a supposed

17

integral part of the deal despite its not being included in any contract document further strikes the Court as a post-hoc justification which the record simply does not support.

Rather, the record supports the contrary conclusion.  Plaintiff sought to satisfy its obligations within a reasonable time, given the overall scope of the agreement.  See Brady v. Central Excavators, Inc., 316 Mich. 594, 608, 25 N.W.2d 630, 635 (1947) ("[W]hen a written contract is silent as to time of performance, a reasonable time is to be presumed without reference to parol evidence.").  The record indicates that Plaintiff began securing a shipping contract within several weeks of signing the invoice, that after encountering some difficulty in obtaining open top containers an alternative plan was developed, and that by mid-August packing and shipping of the 1000-ton presses was well underway. The invoice contemplated alternatives to open top containers ("skids for break bulk") (Pl.'s Mot. for Summ. J. Ex. 1), and had General Rigging permitted Plaintiff to finalize logistics it is clear that the presses could have shipped by the September 30 deadline.

Under such circumstances, no reasonable jury could find that Plaintiff repudiated its obligations under the terms of the contract, where Plaintiff provided evidence that it was in the process of fulfilling this obligation well before the presses were due to ship, and any delays in performance did not substantially impair the value of the contract under Mich. Comp. Law § 440.2610.

> **3.    Plaintiff Did Not Fail to Give General Rigging "Adequate Assurances," Where General Rigging Made No Clear Demands Under Mich. Comp. Laws § 440.2609.**

18

General Rigging argues that Plaintiff's failure to provide adequate assurances of the shipping arrangements in the weeks following July 2, 2008 gave General Rigging grounds under Mich. Comp. Laws § 440.2609 to repudiate the contract.  Plaintiff counters that General Rigging's "demand" did not seek adequate assurances that Plaintiff would perform, but rather threatened to cancel the agreement unless Plaintiff paid the full contract price up front.  This issue turns on the parties' differing charaterizations of Francis Blake, Sr.'s August 4, 2008 email, which confronted Plaintiff with the "lack of progress" on shipping arrangements. (Pl.'s Mot. for Summ. J. Ex. 10.)  Mr. Blake explained that without a commitment of containers for shipping the seven presses, General Rigging could not proceed as originally set out in the contract.  Instead, he offered three "solutions," which included cancelling the deal for the two 1600-ton presses, accepting immediate payment for all seven presses, or cancelling the contract altogether.  (Id.)  In light of these facts, the Court finds Plaintiff's argument persuasive—the August 4 email was not a "demand" under Section 440.2609.

This provision permits a party to a contract with reasonable grounds to believe the other party to the contract will not perform to "demand adequate assurance of due performance" and to suspend its own performance, if commercially reasonable to do so. Mich. Comp. Laws § 440.2609(1), (4).  "Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards."  Mich. Comp. Laws § 440.2609(2).  Generally questions of whether a party provided "adequate assurance" and whether the other party

19

had "reasonable grounds for insecurity" to ask for that assurance are fact questions left to

the jury.  See id. cmt. 4; see also 1 James J. White & Robert S. Summers, Uniform

Commercial Code § 6-2 (4th ed. 2000) ("[T]he trier of fact must normally answer whether

grounds for insecurity exist.").  However, in some circumstances the Court may

determine that as a matter of law, no reasonable jury could find that assurance was

inadequate nor that a party had reasonable grounds for insecurity to ask for that

assurance.  See By-Lo Oil Co., Inc. v. Partech, Inc., No. 00-1148, 11 Fed. Appx. 538, 539

(6th Cir. May 30, 2001).

Assuming *arguendo* that there were reasonable grounds for General Rigging's

insecurity,[3] the August 4, 2008 email cannot be construed as a demand for adequate

assurance of performance.  Rather, this contention, dressed up as a legal argument, is

simply an extension of General Rigging's post hoc justification for its own premature

breach.  The email did not seek merely "adequate assurances" of performance—a

necessary first step to suspension of performance—but rather comprised a unilateral

attempt to alter or cancel the contract.  Although the email explained the basis for General

Rigging's concerns—namely cash flow problems and the belief that without containers,

the presses would not be ready for shipment for another 30 to 45 days—it concluded with

_____

[3]  And, in fact, there might have been grounds for some concern on General Rigging's
side, as the record indicates that Plaintiff's representatives repeatedly suggested that
shipping arrangements were progressing more quickly than they actually were, giving the
impression that open top containers would be available as early as mid to late July.  There
is no dispute that Plaintiff underestimated the difficulty of obtaining open top containers.

an ultimatum. Such a writing is not a "demand" under Section 440.2609. See 4 Lary

Lawrence, Anderson on the Uniform Commercial Code § 2-609:33 (3d. ed. 2009) ("Any

communication that does not clearly manifest that a demand for assurance of performance

is being made does not satisfy UCC § 2-609."); Precision Master, Inc. v. Mold Masters

Co., Nos. 268501, 268938, 2007 WL 2012807, at *4 (Mich. Ct. App. Jul. 12, 2007)

(holding that letters demanding alteration of actual contractual terms did not constitute

merely "adequate assurances" of performance under Section 440.2609(1), but were a

unilateral attempt to improve contract provisions); Petroleo Basileiro S.A., Petrobras v.

IBE Grp., Inc., No. 93-3305, 1995 WL 326502, at *6 (S.D.N.Y. May 31, 1995)

(precluding defendant's reliance on U.C.C. § 2-609 where the defendant's demand

proposed to amend the existing contract rather than seek assurances of performance).

     Here, the email made no reference to the UCC and did not explicitly or implicitly

request any assurance of performance. Rather, it recited the consequences of the delay

and threatened breach absent immediate payment—something General Rigging had no

doubt already decided to do to remedy its severe cash crunch, since the next day, August

5, 2008, it reinitiated negotiations with Titan for the 1600-ton presses without revealing

the contract on those same presses with Plaintiff (indeed, General Rigging represented to

Titan that the presses were "free and clear"), and then, the following day, issued an

invoice to Titan for the presses at a price of $225,000 each—as compared to the $172,500

each in the contract with Plaintiff—plus significantly increased shipping fees. The Court

will have more to say about this unhappy factual chronology—and that General Rigging

21

failed to disclose the already consummated Titan deal when Plaintiff's representative came to South Bend on August 8, 2008.

Even if read together with emails sent in the preceding weeks which sought updates on Plaintiff's progress in securing a shipping contract and communicated a sense of urgency, nothing in General Rigging's correspondence with Plaintiff can be construed as a demand for adequate assurance as contemplated by the UCC. See MG Refining & Marketing, Inc. v. Knight Enterprises, Inc., No. 94-civ-2512 , 1996 WL 229138, 28 U.C.C. Rep. Serv. 2d 1239 (S.D.N.Y. 1996) (holding that two letters that followed alleged repudiation of contracts did not constitute demand for adequate assurance under New York enactment of UCC § 2-609, where first letter invoked alleged breaches to initiate discussion about terminating the contracts, and the second letter announced the buyer's termination of its performance).  Given these facts, no reasonable jury could find that Mr. Unnikrishnan's response—stating that there it was under no obligation under the terms of the contract to supply containers within one week and that Plaintiff was in the process of finalizing logistics with Kuehne+Nagle—constituted inadequate assurances.

The Court readily concludes that General Rigging cannot establish that Plaintiff had an obligation to provide shipping containers within a set time frame, or that Plaintiff's alleged repudiation of its obligations substantially impaired the value of the contract.  Neither can General Rigging show that it made a demand for adequate assurances, such that Plaintiff's response that it would continue to honor the terms of the contract could be deemed an inadequate answer.  Therefore, as a matter of law, General

Rigging cannot avail itself of the remedies set out in either Section 440.2610 (anticipatory repudiation) or Section 440.2609 (demand for adequate assurances). There remain no genuine issues of material fact with respect to General Rigging's breach: the parties entered into a valid contract, under which General Rigging was required to sell two 1600-ton presses to Plaintiff, shipped by September 30, 2008. By selling the presses to Titan in August, General Rigging rendered its own performance impossible.[4] Failure to deliver the promised goods constituted a clear breach. The Court therefore grants Plaintiff's summary judgment motion as to General Rigging's liability on the breach of contract claim.[5]

## C.    Fraud

In addition to alleging breach of contract, Plaintiff claims that the individual defendants, Francis Blake, Jr., Francis Blake, Sr. and Patrick Blake, are individually liable to Plaintiff for fraudulently misleading the company into modifying the payment

---

[4]    General Rigging argues in passing that "the [1600-ton] presses are easily replaced with other available presses," and that General Rigging made numerous "offers to provide cover for the 1600-ton presses." (Def.'s Br. in Opp'n 3.) This is simply another post-hoc rationale for its breach. There is no evidence in the record that General Rigging actually had access to two 1600-ton presses with the specifications Plaintiff needed and that it had the capacity to dismantle and ship those presses by September 30, 2008. Moreover, the sale of the 1600-ton presses and subsequent failure to inform Plaintiff of this repudiation provided more than sufficient grounds for Plaintiff to suspend its own performance and sue immediately for breach of contract, pursuant to Mich. Comp. Laws § 440.2610.

[5]    Plaintiff further claims that there is no genuine issue of material fact as to its damages for General Rigging's breach. However, the issue has not been comprehensively briefed. Therefore, the Court withholds judgment, addressing only the issue of liability in this Opinion.

terms of the contract by failing to disclose the fact that General Rigging sold the 1600-ton

presses to Titan.  General Rigging argues that any fraud claim is barred by the economic

loss doctrine, though it does not dispute that the individual defendants concealed or

deliberately remained silent about the sale of the presses to Titan, while Plaintiff

continued to make arrangements for their shipment.  The Court finds that the economic

loss doctrine does not apply, where the alleged fraud is wholly extraneous to Plaintiff's

contract claims.  The Court further finds that Plaintiff has established every element of a

claim of fraud.

   The economic loss doctrine bars a party from recovering in tort economic losses

suffered because of a breach of duty assumed only by contract.  Huron Tool and

Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 374, 532

N.W.2d 541, 546 (1995) (citing Neibarger v. Universal Cooperatives, Inc., 439 Mich.

512, 530, 486 N.W.2d 612, 619 (1992)).[6]  The doctrine does not however preclude a

buyer from seeking tort remedies against a seller in all fraud claims.  See id.  For

---

[6]  The Michigan Supreme Court explained the basis for this distinction in Neibarger:

> The purpose of a tort duty of care is to protect society's interest in freedom
> from harm, i.e., the duty arises from policy considerations formed without
> reference to any agreement between the parties.  A contractual duty, by
> comparison, arises from society's interest in the performance of promises.
> Generally speaking, tort principles, such as negligence, are better suited for
> resolving claims involving unanticipated physical injury, particularly those
> arising out of an accident.  Contract principles, on the other hand, are
> generally more appropriate for determining claims for consequential
> damage that the parties have, or could have, addressed in their agreement.

486 N.W.2d at 615.

24

example, the doctrine does not apply where no contractual relationship exists between the parties or when the alleged fraud is extraneous to the contractual claims.  Id.

In this case, Plaintiff's fraud claim is not based on General Rigging's failure to comply with its contractual obligations, but rather on the Blakes' silent fraud or deliberate misrepresentations, which induced Plaintiff to enter into additional undertakings.  These additional undertakings—not provided for in the contract—included paying more money than required for the presses actually delivered and continuing to make shipping arrangements when none were warranted.  Indeed, well after General Rigging's breach of contract, the Blakes sought to hide the fact that the 1600-ton presses were no longer available, all while renegotiating the terms of the contract for the remaining five presses. As such, the claimed fraud is wholly extraneous to the contractual claims and the economic loss doctrine does not apply.

Under Michigan law, the elements of fraud are: (1) that the charged party made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury.  M&D, Inc. v. W.B. McConkey, 231 Mich. App. 22, 27, 585 N.W.2d 33, 36 (1998).  In order to establish a claim of silent fraud, there must be some type of misrepresentation, whether by words or action.  Id., 585 N.W.2d at 41; see also Hendricks v. DSW Shoe Warehouse, Inc., 444 F. Supp. 2d 775, 782 (W.D. Mich. 2006).  A party

25

who remains silent when fair dealing requires him to speak may also be guilty of fraudulent concealment.  Nowicki v. Podgorski, 359 Mich. 18, 31-32, 101 N.W.2d 371, 378 (1960); see also Boumelhem v. Bic. Corp., 535 N.W.2d 574, 579 (Mich. Ct. App. 1995) ("A misrepresentation of fact may be shown where the defendant had a duty to disclose facts but suppressed them instead.").

Plaintiff has established each element of a fraud claim.  All three Blakes were involved in either the negotiation or re-negotiation of the invoice terms.  All knew that General Rigging had already sold the 1600-ton presses to Titan, while Plaintiff continued to make arrangements for shipment.  Although Plaintiff's machinery agent, Mr. Shukla, was often in General Rigging's Detroit office in August while the details of the shipping arrangement were being worked out, none of the individual defendants informed him of the sale.  As late as August 26, 2008, both Francis Blake, Jr. and Francis Blake, Sr. knew that Mr. Shukla was driving to South Bend, Indiana to oversee the dismantling of the 1600-ton presses, but neither defendant informed him that the presses were already being dismantled for delivery to Titan.  (Blake Sr. Dep. 91:23-92:6.)  Mr. Blake, Sr. only admitted to having sold the presses to Titan after Mr. Shukla confronted him upon returning from South Bend—and, Mr. Blake conceded that he had kept silent about the sale to Titan so that Plaintiff would not back out of the deal on the five remaining 1000-ton presses.  (Blake Sr. 92:22-93:1.)  Similarly, to continue the ruse, Patrick Blake continued to meet with Ms. Loeman and Mr. Shukla through mid-August, formulating a shipping plan for all seven presses and providing them with information about the weight

26

and dimensions of the presses, all despite knowing that the two 1600-ton presses were already sold to Titan.  Based on the belief that General Rigging still planned to sell all seven presses, Plaintiff continued to make shipment arrangements with Kuehne+Nagel.  Plaintiff also agreed to modify the payment schedule and advance $400,000 to General Rigging in two lump sums.  These advances, in combination with the $175,000 already on deposit, totaling $575,000, exceeded the amount owed for the five 1000-ton presses that were ultimately delivered.  Mr. Unnikrishnan testified that had he known that the 1600-ton presses were not available at the time the payment schedule was renegotiated, he would not have agreed to pay more money than the amount owed for the 1000-ton presses alone.

These facts, undisputed by General Rigging, are sufficient to establish a claim of fraud as a matter of law: (1) the Blakes represented a material fact, i.e., that the presses were still available as promised under the invoice; (2) the representation was false; (3) the Blakes knew it was false when it was made; (4) the Blakes made the representation with the intent that Plaintiff follow through with the rest of the agreement; (5) Plaintiff continued to make shipping arrangements for the 1600-ton presses and entered into renegotiations based on the Blakes' representation; and (6) Plaintiff thereby suffered an injury.[7]  Accordingly, the Court concludes that Plaintiff has satisfied, as a matter of law,

---

[7]     The Court notes that although Plaintiff has shown that it continued to make shipping arrangements for the 1600-ton presses and it overpaid by $75,000, it is unclear what damages if any beyond the return of the overpayment it will gain from this fraud claim.  The $75,000 was part of an initial deposit made in mid-July to secure the terms of the contract, well before the fraud occurred.  The two additional $200,000 lump sum

that Francis Blake, Sr., Francis Blake, Jr. and Patrick Blake's are individually liable for fraud.

**D.    Conversion Claim**

Finally, Plaintiff asserts that General Rigging converted the $75,000 deposit, held in excess of the $500,000 owed on the five 1000-ton presses actually delivered.  General Rigging admits that it received $75,000 as part of the $175,000 deposit due under the invoice and that it has failed to return the money for lack of liquidity.  The deposit was not held in escrow or otherwise segregated from General Rigging's other accounts.

Although the economic loss doctrine does not bar Plaintiff's fraud claim, in contrast the Court is unable to see how Plaintiff's conversion claim is distinct from the breach of contract.  As discussed in the preceding section, the economic loss doctrine prevents plaintiffs from pursuing an action in tort where there is no duty separate and distinct from a breach of contract.  See Haas v. Montgomery Ward and Co., 812 F.2d 1015, 1016 (6th Cir. 1987); see also Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 486 N.W.2d 612, 615 (1992); Wrench LLC v. Taco Bell Corp., No. 1:98-CV-45, 2003 WL 21653410, at *3 n.4 (W.D. Mich. May 01, 2003) (summarizing several federal court decisions which have applied the economic loss doctrine to bar tort claims, such as conversion, where they are mere restatements of contract claims).   Here, General

---

payments were made expressly for the 1000-ton presses alone, which were ultimately shipped to Plaintiff.  Finally, Ms. Loeman testified that Plaintiff did not incur any additional costs from Kuehne+Nagel by making shipping arrangements in August for the 1600-ton presses.  Nevertheless, material issues of fact remain with respect to Plaintiff's damages for the fraud claim.

28

Rigging's only duty to Plaintiff with respect to the deposit is set by contract; the parties have no independent relationship and the deposit was tendered under the terms of the invoice, not wrongfully taken.  Moreover, General Rigging has not denied its contractual obligation to return the overpaid funds.  Thus, Plaintiff has failed to establish an independent legal duty distinct from the duties arising out of the contractual relationship and, accordingly, cannot sustain its claim of conversion.  See Rinaldo's Const. Corp. v. Michigan Bell Telephone Co., 454 Mich. 65, 78-79, 559 N.W.2d 647, 656 (1997).  The Court accordingly dismisses Plaintiff's claim of conversion.[8]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's February 4, 2009 Motion for Summary Judgment (docket # 14) is GRANTED in part as to Defendant General Rigging's liability on the breach of contract claim and as to individual Defendants, Francis Blake, Sr., Francis Blake, Jr. and Patrick Blake's liability on the fraud claim.

---

[8]  Although General Rigging concedes that it owes Plaintiff $75,000, the Court does not reach the question of Plaintiff's damages for General Rigging's breach of contract, as noted above.  *Supra* note 5.

29

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is

DENIED as to General Rigging's liability on the conversion claim, and that the

conversion claim is hereby DISMISSED.


                                             s/_____
                                             Gerald E. Rosen
                                             Chief Judge, United States District Court

Dated: September 30, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on
September 30, 2009, by electronic and/or ordinary mail.

                                             s/Ruth A. Brissaud_____
                                             Case Manager
                                             (313) 234-5137